IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BARBARA VALDORA, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 08-5519 (JBS) |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert Anthony Petruzzelli, Esq.
JACOBS, SCHWALBE & PETRUZZELLI, PC
Woodcrest Pavilion
Ten Melrose Avenue, Suite 340
Cherry Hill, NJ 08003
     Attorney for Plaintiff

Sixtina Fernandez, Special Assistant United States Attorney
SOCIAL SECURITY ADMINISTRATION
26 Federal Plaza
Room 3904
New York, NY 10278
     Attorney for Defendant

**SIMANDLE**, District Judge:

     This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration denying the application of

Plaintiff, Barbara Valdora ("Plaintiff"), for disability

insurance benefits ("DIB") under Sections 216(i) and 223 of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423, and for

supplemental security income benefits ("SSI") under Section

1614(a)(3)(A) of the Act, 42 U.S.C. § 1382c(a)(3)(A).  The Court must decide whether substantial evidence supports the determination of the Administrative Law Judge ("ALJ") that Plaintiff had the residual functional capacity to perform other work available in the national economy, thus rendering her ineligible for DIB and SSI.  The Court must further determine whether ALJ's opinion is consistent with governing law.  For the reasons set forth below, the Court will vacate the decision of the ALJ and remand for further proceedings consistent with this opinion.

I.   **BACKGROUND**

   A.   **Procedural History**

   Plaintiff filed her application for DIB and SSI on July 23, 2004, alleging a disability onset date of July 5, 2002.  That application was denied both on initial review and on reconsideration.  Plaintiff sought an administrative hearing, which was held on July 22, 2006 before the ALJ.  During the July 22nd hearing, the ALJ requested a post-hearing consultative medical exam and, on request of Plaintiff's prior counsel, the ALJ held a supplemental hearing on November 30, 2006 to address the new report.  On December 27, 2006, the ALJ issued his opinion denying Plaintiff entitlement to DIB and SSI.  Plaintiff sought review of that decision, and the Appeals Council denied that

2

request.  Thus, the decision of the ALJ became the final decision of the Commissioner.  Plaintiff timely filed this action.

**B.    ALJ Opinion**

The ALJ first found that Plaintiff met the insured status requirements for disability benefits through December 31, 2007, pursuant to 42 U.S.C. § 423(c).  (R. at 21.)

The ALJ proceeded through the five steps of analysis required by regulation.  (R. at 21-37.)  At step one, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" at any time since her alleged disability onset date of July 5, 2002.  (R. at 21.)  At step two, the ALJ found that Plaintiff suffered from the following severe impairments: post left ulnar nerve[1] transposition and decompression, scoliosis, left carpal tunnel syndrome, reflex sympathetic dystrophy syndrome ("RSDS")[2] of the left arm, post traumatic stress

---

[1] The ulnar nerve extends along the ulnar, or medial, aspect of the arm, as compared to the radial (lateral) aspect of the arm.  The Sloan-Dorland Annotated Medical-Legal Dictionary (hereinafter "Dorland") 492, 758 (West Publishing Company 1987).

[2] Social Security Rule 03-2p defines RSDS, also known as complex regional pain syndrome ("CRPS"):

> RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity. It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS/CRPS. The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be

disorder ("PTSD"), and adjustment disorder.  (R. at 22.)  At step three, the ALJ found that these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 22-24.)

At step four, the ALJ first found that for the relevant period, Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work.  (R. at 25-34.) According to the ALJ, Plaintiff

> is able to lift/carry less than ten pounds frequently and ten pounds occasionally; can walk for two hours in an eight hour workday and twenty minutes continuously; is able to stand for two hours in an eight hour workday and continuously [for] fifteen minutes; can sit for six hours in an eight hour workday and one hour continuously; can occasionally climb stairs, bend, and stoop, but can never climb ladders; can occasionally reach horizontally and vertically with the left (dominant) arm and occasionally handle/feel with the left hand; can frequently relate to co-workers, the public, and supervisors; and is restricted to work with simple tasks and simple instructions.

(R. at 27.)

The ALJ based his opinion on medical reports of Plaintiff's treating physicians, Dr. John M. Bednar and Dr. Alan F. Kwon, consulting physicians Dr. Frederic Brustein and Dr. Ronald

---

> associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time.

4

Bagner, psychologist Dr. David T. London, an initial intake
assessment by Cape Counseling Services, and as assessments by
State Agency medical and psychological consultants.  (R. at 27 -
32.)  The ALJ gave no weight to the opinions of Dr. Richard D.
Rubin and Dr. Sidney Tobias "as neither doctor was [] a treating
physician and only examined [Plaintiff] once."  (R. at 30.)  In
addition, the ALJ observed it was unclear whether treatment could
help reduce the symptoms Dr. Rubin described when diagnosing
adjustment disorder.  (Id.)  The ALJ observed: "While Dr. Rubin
reported [Plaintiff] as having a permanent disability, he does
not relate this in terms of the various exertional levels, such
as light and sedentary, and even noted that Ms. Valdora could do
50% of the easiest of all activities of the left arm."  (Id.)
Dr. Tobias' opinion, according to the ALJ, is inconsistent with
his own observation that Plaintiff's RSDS was in remission and
lacked evidentiary support.  (R. at 30-31.)  Finally, the ALJ
stated that both Dr. Rubin's and Dr. Tobias' opinions were
inconsistent with the opinion of Dr. Brustein.  (R. at 31.)

     The ALJ summarized Plaintiff's testimony during the two
hearings, (R. at 25-26), but found her testimony only credible to
the extent that it supported a RFC of limited sedentary work, (R.
at 34).  The ALJ found Plaintiff's testimony regarding the
severity of her limitations to be contradicted by her own
testimony regarding her daily activities and the preponderance of

5

the medical evidence in the record.  (R. at 33-34.)  The ALJ
elaborated:

> The medical records, as previously discussed, fail
> to support the claimant's subjective complaints and
> functional limitations.  While she indicated she
> has very little use of her left arm, there are many
> citations in the records from various physicians,
> such as Dr. Kwon, Dr. Bednar, and Dr. Bagner, which
> documents her having full grip and pinch strength.
> Also, Dr. Rubin cited the claim as being able to do
> 50% of the easiest of all activities of the left
> arm.

(R. at 34.)

Having explained his RFC, the ALJ concluded his step four
analysis by finding that Plaintiff is unable to perform any of
her past work.  (R. at 34-35.)  In so finding, the ALJ relied on
the opinion of Mitchell Schmidt, a vocational expert.  (Id.)

Finally, at step five the ALJ concluded based on Mr.
Schmidt's testimony that Plaintiff has the ability, given her RFC
for limited sedentary work, to perform other jobs existing in
significant numbers in the national market.  (R. at 35.)
Specifically, the ALJ found that Plaintiff could perform work as
a call out operator and a surveillance system monitor, for which
there were significant numbers of existing jobs.  (R. at 36.)
Consequently, the ALJ found that Plaintiff was not disabled.  (R.
at 37.)

6

C.   **Evidence in the Record**

    1.   Plaintiff's Testimony and Application Materials

Plaintiff is a single mother of three children, now adults,
with a General Education Degree and two semesters of college. (R.
at 532-33.)  During her two hearings before the ALJ, Plaintiff
testified as to the various ways that her medical conditions, and
in particular the pain in her left arm, interfere with her
ability to function.  Plaintiff described the pain.  The pain in
her left arm is constant and becomes worse through the day.  (R.
at 518-19.)  The pain is throughout the arm, with particular
burning in the biceps and triceps.  (Id.)  Sometimes the pain
travels into her shoulder blade and neck, causing a burning
sensation.  (Id.)  She testified that if she uses her arm too
much, she will have pain all the way down her arm and then the
arm will go numb - she loses control of her index and pinkie
fingers.  (R. at 515.)  Her left arm is particularly sensitive to
cold and when it comes in contact with something cold, Plaintiff
feels a burning sensation in her biceps and triceps.  (R. at 515-
16.)  Frequently her left arm will feel a tearing pain -- similar
to the pain of hitting the funny bone -- even when nothing has
hit her arm.  (R. at 516.)  Her arm is also very cold to the
touch.  (R. at 519.)  Plaintiff testified that when she hits her
arm or hand against something, she feels severe pain shooting up
her arm and her arm gets cold.  (R. at 527.)  Sometimes it will

take approximately a day to "calm down."  (Id.)  Similarly, if
Plaintiff overuses her left arm one day, then she will not do
much with the arm the next day.  (Id.)

Plaintiff currently has no health insurance, but she is
receiving medical care through an organization called Volunteers
in Medicine.  (R. at 531.)  In addition, she receives counseling
at Cape Counseling.  (R. at 530-31.)  Plaintiff testified that
she has taken, and continues to take, medications to address her
physical and psychological problems.  Until June 2006, Plaintiff
was taking the antidepressant Nortriptyline, which affected her
skin.  (R. at 520.)  As of June 2006 she was still taking
Neurontin[3] and occasionally she takes Orphenadrine,[4] a muscle
relaxer.  (R. at 522.)  Plaintiff testified that her medications
do not reduce her pain.  (R. at 523.)  She further stated that
her medications make her "a little drowsy" and "foggy."  (R. at
524.)  Plaintiff testified that her memory is no longer "up to
par" -- that she will occasionally walk into a room and not
remember why she went there.  (Id.)  She is unsure whether this

---

[3] Neurontin is indicated for the management of postherpetic
neuralgia in adults, as well as epilepsy.  Physician's Desk
Reference for Prescription Drugs, 2559-60 (58th ed. 2004).
Neuralgia is paroxysmal pain which extends along the course of
one or more nerves.  Dorland, at 493.

[4] Orphenadrine citrate is indicated as an adjunct to rest,
physical therapy, and other measures for the relief of discomfort
associated with acute painful musculoskeletal conditions.
Physician's Desk Reference for Prescription Drugs, 1868 (58th ed.
2004).

is due to the medications or the RSDS.  (Id.)  Finally, she testified that she has become more irritable. (Id.)

Plaintiff testified that her RSDS and the associated pain impact her ability to care for herself.  She cannot wear a bra and can only wear loose-fitting, light-weight clothing over her left arm.  (R. at 514, 519.)  She will lose strength in her left arm and then cannot brush her hair or teeth.  (R. at 514.)  Some days her boyfriend has dressed her and helped to brush her teeth.  (R. at 529.)  She can cook simple things, though she needs someone there to help, but after cooking she will be in too much pain and lacks the strength to clean the dishes.  (R. at 516.)  She can go shopping, but cannot do all her shopping at once because she pushes the cart with her right arm, which starts to swell and hurt.  (Id.)  She similarly does laundry and cleans using her right arm, though there are times when both of her arms "get very heavy feeling and weak at the same time."  (R. at 517.)

Plaintiff testified that she has limited strength in her left hand, though she is not certain exactly how much she can safely do with it.  As she explained, "I don't know how far to push myself."  (R. at 515.)  She cannot open cans of soda, and has to use tweezers to untie knots.  (Id.)  She cannot garden or do Pilates or back exercises because of her arms.  (R. at 524-25.)  She can ride on a stationary exercise bike and use a hula

hoop.  (R. at 527.)  She also tries to do a lot of walking.
(Id.)

Plaintiff finds her physical limitations "very degrading"
and feels "very helpless and alone and worthless."  (R. at 529-
30.)  Consequently, in June 2006, Plaintiff began receiving
counseling at Cape Counseling.  (R. at 539.)  In addition,
Plaintiff has begun speaking to her counselor about physical
abuse she suffered as a child and in her marriages.  (R. at 539-
40.)  She did seek counseling until recently because she finds it
difficult to discuss these problems.  (Id.)

In addition to her difficulties with her left arm, Plaintiff
testified that she has arthritis in her lower back that
deteriorated over the past four years.  (R. at 525-26.)
Plaintiff testified that recently, a Dr. Muser diagnosed her with
a moderate to mild carpal tunnel syndrome in the right wrist.
(R. at 536-37.)  Sometimes her right arm becomes very weak and
she will drop things.  (R. at 538.)

When asked, Plaintiff testified that she would not be able
to maintain a job five days a week, eight hours a day.  (R. at
540-42.)  She states: "Right now I think I would be more of a
liability than an asset to anybody because of days where I can't
get out of bed."  (R. at 541.)  She further explained that there
are days when she can't even shower because of the pain.  (R. at
541-42.)

10

Finally, during the supplemental hearing, Plaintiff testified that Dr. Ronald Bagner, the Department of Labor consultant, spent only seven to ten minutes examining her, during which time he had her move her arms, bend, and checked her reflexes.  (R. at 551-57.)  He did not ask her about her pain. (R. at 552.)

Prior to giving testimony, and in the years following the work accident, Plaintiff submitted a series of materials in support of her applications for benefits.  On August 18, 2004, Plaintiff completed a "Function Report -- Adult" where she described her daily activities as making the bed, taking a break ("to let my arm calm down"), washing the dinner dishes from the night before, taking a break, doing a load of laundry and using the exercise bike, and taking a break.  (R. at 122.)  She described having a hard time dressing and tying her shoes.  (R. at 123.)  She needed someone to cut her meat for her and sometimes had trouble using the bathroom.  (Id.)  She did not cook unless someone is there to help her.  (R. at 124.)  She went grocery shopping twice a week for no less than one hour.  (R. at 125.)  She could not drive for more than twenty minutes.  (Id.) She noted at the end that her activities are not the same each day -- that she had "good days and lots of bad days."  (R. at 129.)  On the bad days she did the "bare minimum of activities." (Id.)

11

In a "Pain Report -- Adult" dated August 20, 2004, Plaintiff described the pain in her left arm as "continuous and chronic" so that it sometimes wakes her up at night. (R. at 141-47.) She explained, "There are a lot of days I can't dress myself, [or] brush my teeth. I hurt to[o] much to shower." (Id.) She acknowledged that the two ganglion blocks she received from Dr. Alan Kwon relieved her pain for a short time. (R. at 142.) On April 10, 2005, Plaintiff reported that the pain had "intensified" and was not alleviated by pain medication. (R. at 172-73.) She reported that she could no longer do the dishes or cook and that she could not go shopping alone. (R. at 174.) She repeated that her "activities vary from day to day, depending on the pain and weather [sic] I have a goodnite or badnite [sic] of sleep." (R. at 174.)

2. <u>Medical Evidence</u>

Plaintiff's alleged disabling conditions arose following a work accident at a hardware store. (R. at 245, 315.) On June 18, 2002, Plaintiff was "attempting to close tomato lattice for a customer when a co-worker opened a steel door which struck her around the left ulna." (R. at 245, 315) She suffered from "shooting, stabbing pain going down to her left hand" and after approximately one week with no improvement Plaintiff came under the care of Dr. Jack Facciolo, Doctor of Osteopathy. (R. at 246, 203-07, 315-16, 351-86.) On August 23, 2002, Dr. Facciolo

12

performed a decompression on the ulnar nerve.  (R. at 339.)

### (a)  Dr. Glenn Zuck, January 2003 - April 2003

By January 2003, Dr. Glenn Zuck, a doctor of osteopathy, took over Plaintiff's care.  (R. at 211-25.)  On January 9, 2003, Dr. Zuck noted that Plaintiff complained of "radiating pain" and "sensory deficit" in her index and little finger.  (R. at 219.) On January 14, 2003, Dr. Zuck performed another ulnar nerve decompression, this time also transposing the ulnar nerve.  (R. at 211-12.)  On January 22, 2003, Dr. Zuck reported that Plaintiff had "no significant pain" and was "very excited about her post operative results."  (R. at 218.)  On April 7, 2003, Dr. Zuck reported that Plaintiff's pain appeared to have been exacerbated over the past three weeks, with temperature changes in her arms and occasional radiation of pain in her shoulder. (R. at 213.)  He stated, "She has a functional range of motion lacking the last few degrees of terminal extension, however, I could flex her to approximately 140 degrees."  (Id.)  He found no swelling, erythema or induration[5] and concluded, "From an orthopedic standpoint, [Plaintiff] has reached maximum medical improvement."  (Id.)

---

[5] Erythema is redness of the skin produced by congestion of the capillaries.  Dorland, 262.  Erythema induration is a chronic killing of the blood vessels.  Dorland, 263.

13

### (b)  Dr. John Bednar, May 2003 - August 2003

On May 27, 2003 and August 28, 2003, Dr. John Bednar of the South Jersey Hand Center examined Plaintiff.  (R. at 311-317.) On May 27, 2003, Dr. Bednar noted that since Dr. Zuck's surgery, Plaintiff reported that "on returning to using her arm [she] developed recurrent pain, which has increased."  (R. at 315.) Dr. Bednar found slightly limited motion in Plaintiff's left shoulder and arm, as compared to her right should and arm.  (R. at 316.)  Dr. Bednar concluded that further surgery was not recommended if a future electromyography[6] ("EMG") is normal and found that Plaintiff would reach "maximal medical improvement" with permanent restrictions that included a "10-lb lifting limit with repetitive activities involving the upper extremity in terms of push-pull, power-grip or fine manipulation."  (R. at 317.)  He completed a vocational rehabilitation services physical activities evaluation in which he found: Plaintiff could lift and carry up to 10 lbs occasionally; Plaintiff could never use her hands for "repetitive action" such as simple grasping, pushing/pulling arm controls, and fine manipulation; Plaintiff could use her feet for repetitive movements; Plaintiff can frequently bend and squat, occasionally reach with her right arm only, and never crawl or climb and; Plaintiff is totally

---

[6] An electromyography is the recording and study of the intrinsic electrical properties of skeletal muscle.  Dorland, 243.

restricted from activities involving unprotected heights, moderately restricted from being around moving machinery and exposure to marked changes in temperature/humidity, mildly restricted from driving automotive equipment, and not restricted from exposure to dust, fumes, and gases.  (R. at 313.)  Dr. Bednar concluded his report by indicating that Plaintiff could work full time.  (<u>Id.</u>)

On August 28, 2003, Dr. Bednar saw Plaintiff again following an EMG, which he found did not call for surgery.  (R. at 311.)  Plaintiff complained of "persistent pain involving her left arm, radiating to her shoulder with burning and weakness."  (<u>Id.</u>)  Dr. Bednar listed impressions of ulnar neuropathy of the left elbow, CRPS of the left arm, and neuritis of the left wrist.  (<u>Id.</u>)  He then recommended that she obtain an evaluation and treatment with a pain management specialist.  (R. at 312.)

### (c)  Dr. Alan Kwon, November 2003 - March 2005

In November 2003, Dr. Alan Kwon, a pain management specialist, began to see Plaintiff.  (R. at 240-251, 409-447.)  On November 19, 2003, Dr. Kwon recounted the history of Plaintiff's difficulties with her arm, noting the two surgeries by Dr. Facciolo and Dr. Zuck, with pain returning after each surgery.  (R. at 245-46.)  Dr. Kwon reported that Plaintiff complained of constant aching and burning pain in her left arm.  (R. at 246.)  Through a physical examination Dr. Kwon found that

Plaintiff's left arm was colder than her right.  (R. at 248.)  He
stated: "Range of motion remains good at all areas [of her upper
extremities] except for at the elbow.  It is painful for her to
open and close her hand but she has no limitation."  (Id.)  As to
Plaintiff's reports of pain, Dr. Kwon stated: "The Pain Drawing
initially appears to represent symptom magnification.  However,
it has more of an appearance on the second view that she is
attempting to relay her symptoms as accurately as possible."
(Id.)

    In December 2003 and January or February 2004, Dr. Kwon
performed two left stellate ganglion[7] blocks which reduced
Plaintiff's pain and warmed her left hand.  (R. at 419-437.)  On
January 9, 2004, Dr. Kwon reported Plaintiff's reduced pain
following the first nerve block, he concluded that Plaintiff had
"primary pain disorder, with a significant component of
sympathetically mediated pain, but does not have RSD."  (R. at
430.)  He further concluded that while she was unlikely to return
to pre-injury condition, "her prognosis for improvement in
function is good to very good."  (R. at 431.)  Finally, he agreed
that Plaintiff could perform work duties at the level recommended
by Dr. Bednar in his May 27, 2003 physical activities report.
(Id.)  By January 19, 2004, Dr. Kwon reported that while

---

[7] The stellate ganglion is a knotlike mass of nerves whose
fibers are distributed to the head, neck, heart, and upper limbs.
Dorland, 307.

16

Plaintiff continued to report relief from pain due to the nerve
block, she did "have some pain with some limitation of range of
motion." (R. at 426.)  On February 9, 2004, Dr. Kwon reported
"remarkabl[e]" improvement following Plaintiff's second nerve
block with "virtually no pain in her hand," though the more she
used her arm the more "discomfort" she felt. (R. at 423.)  Dr.
Kwon repeated his affirmation of Dr. Bednar's assessment of
Plaintiff's ability to work. (R. at 424.)

On March 29, 2004, Dr. Kwon wrote that Plaintiff reported
"her arm is doing much better," though she still had some days
when her arm felt like it was in spasm. (R. at 416.)  On May 20,
2004, Dr. Kwon diagnosed Plaintiff with ulnar neuropathy and
CRPS/RSDS. (R. at 240-41.)  He found that she had "nearly full
extension at the elbow," with nearly full pronation and
supination. (R. at 240.)  She had "weakness in grip strength,"
"easy fatigability of the left arm and hand," and she continued
to have some burning pain. (Id.)  Dr. Kwon concluded that
Plaintiff had "reached maximum medical improvement for
interventional pain management" and released her from continuous
care. (Id.)  He observed, however, that Plaintiff had
"residuals" with regards to pain management. (R. at 241.)  On
March 21, 2005, Dr. Kwon gave Plaintiff instructions on how to
decrease her medications. (R. at 409.)

17

### (d)   Bacharach Institute for Rehabilitation, March 2004 - April 2004

In March and April 2004, Plaintiff participated in a five-day vocational evaluation at the Bacharach Institute for Rehabilitation.  (R. at 252-64.)  At the conclusion of that Program Carmela Friedman, a vocational specialist, found:

> [Plaintiff] is not a candidate for competitive employment as she continues pain management treatment and physical therapy treatment.  She is unable to use her dominant left hand.  She cannot perform any jobs that require use of both hands.  She is no longer able to perform jobs which are physical in nature.  She would not be able to perform bench work or clerical work.  The job market is limited in Cape May County. [Plaintiff] indicated she is unable to drive for long periods of time to obtain work in Atlantic County.  Both her physical limitations and her driving ability limit her.

(R. at 259.)

### (e)  Dr. Frederic Brustein, July 2004

On July 19, 2004, Dr. Frederic Brustein stated that Plaintiff reported that the two ganglion blocks performed by Dr. Kwon helped significantly, but that she still had symptoms.  (R. at 267.)  Plaintiff reported "persistent numbness and tingling and some aching in the ring and fifth fingers of her left hand." (Id.)  She had a constant ache or pain down her entire left arm into her fingers and her arm felt cold.  (R. at 267-68.)  Dr. Brustein found Plaintiff had a full range of motion in both her elbows, wrists, thumb and fingers.  (R. at 269.)  Dr. Brustein found based on isolated manual muscle strength tests that

18

Plaintiff scored five over five for her bilateral deltoid, biceps, triceps, wrist extensors, wrist flexors, long finger flexors, and long finger extensors.  (Id.)  Dr. Brustein concluded: "The medical impairment rating for the left ulnar neuritis (cubital tunnel syndrome), two surgical procedures and resolved complex regional pain syndrome sympathetic mediated is 5% partial of the left upper extremity."  (R. at 270.)

### (f)  Dr. Richard Rubin, August 2004

On August 5, 2004, Dr. Richard D. Rubin examined Plaintiff and prepared a report.  (R. at 273-79.)  He reviewed her medical history and her medical records and observed that Dr. Kwon's two ganglion blocks led to "moderate relief from her worst complaints of the most severe pains and temperature change" but were discontinued (noting that "usually three or more stellate ganglion blocks are provided").  (R. at 273-75.)  Dr. Rubin then performed a neuropsychiatric evaluation and a neurological evaluation and diagnosed Plaintiff with ulnar neuropathy (left arm), median neuropathy (left arm), carpal tunnel syndrome (left hand), post surgical status times two (left arm), RSDS, preexisting scoliosis, and adjustment aisorder with mixed emotional features.  (R. at 275-79.)  Based on a functional analysis, Dr. Rubin found that Plaintiff cannot do the hardest 50% of all activities of the left arm, but can do the easiest 50% of all activities of the left arm.  (R. at 277.)  Dr. Rubin

19

elaborated on his RSDS diagnosis, stating "I find permanent partial neurologic impairment for Reflex Sympathetic Dystrophy, or Causalgia (which is a medical term which means burning pain) which I rate at 40% of total, not overlapping any neurologic estimate for the ulnar neuropathy." (R. at 278.) Finally, Dr. Rubin explained his neuropsychiatric diagnosis of adjustment disorder as a result of her RSDS, including "a rather morbid depressive preoccupation with loss of health and self-esteem and image of herself as a working unit and objective behavioral behavioral deficits in the conduct of life due to Phobic Avoidance Behavior. She is afraid to use the arm and hand even for those tasks which she would otherwise, physically, be able to perform." (R. at 279.)

### (g)  Dr. Sidney Tobias, August 2004

On August 12, 2004, Dr. Sidney Tobias examined Plaintiff, who complained of pain and weakness in her entire left arm. (R. at 387-91.) Dr. Tobias found Plaintiff's left elbow to be one centimeter smaller in circumference than her right elbow. (R. at 389.) Plaintiff's range of motion in her left elbow was normal, but she complained of pain at the extremes of pronation and supination. (Id.) Dr. Tobias diagnosed Plaintiff with residuals of a contusion to the left elbow with left ulnar neuropraxia, chronic post-traumatic tenosynovitis of the left elbow, and CRPS of the left elbow in remission. (R. at 390.) Dr. Tobias

20

concluded that the medical evidence showed "restriction of function and lessening to a material degree of working ability as well as interference with the ability to perform activities of daily living" and found "a permanent orthopedic disability of 65% of the left arm."  (Id.)

### (h)  Dr. Jack Facciolo, August 2004

On August 31, 2004, having not seen Plaintiff since November 25, 2002, Dr. Jack Facciolo completed a general medical report in which he stated that Plaintiff could lift and carry no more than 10 pounds, and was unable to pull with her left arm, but was not limited in her ability to walk and/or stand or sit.  (R. at 203-04.)

### (i)  State Agency RFC Assessment, October 2004

A state agency RFC assessment, completed on October 28, 2004 by a Dr. J.R. Michel, found that Plaintiff could frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull without limitation.  (R. at 281.)  Dr. Michel noted that Plaintiff could either frequently or never climb (both "frequently" and "never" are indicated) and occasionally balance, and found that Plaintiff was limited in her handling and fingering abilities.  (R. at 282-83.)  Dr. Michel further found no visual, communicative, or environmental limitations.  (R. at 283-84.)  Finally, Dr. Michel noted that his

21

evaluation was prepared without statements from Plaintiff's treating doctor.  (R. at 286.)

### (j)  Dr. David London, December 2004

On December 9, 2004, psychologist Dr. David London performed a mental status examination.  (R. at 288-91.)  During that examination Plaintiff explained that she had been sexually molested by a family member as a girl and physically abused by her first husband.  (R. at 289.)  Dr. London found that Plaintiff had adequate orientation, short term memory and general fund of information.  (R. at 290.)  Her thinking was logical and organized and her insight and judgment seemed appropriate.  (Id.)  Her intermediate and long term memory were functional.  (Id.)  Her affect was mostly bland and her mood was contemplative.  (Id.)  Her concentration and attention "seemed a bit impaired."  (Id.)  Dr. London observed that she "was unable to compute serial sevens correctly beyond the first step."  (Id.)  Dr. London then gave Plaintiff the following DSM-IV Diagnosis: dysthymic disorder; post traumatic stress disorder; CRPS/RSDS; problems related to her social environment, occupation, housing, and finances; and a global assessment function score ("GAF") of 49 (ongoing).  (R. at 291.)  Finally, Dr. London concluded, "[Plaintiff's] capacity for sustained concentration and persistence, social interaction and adaptation is severely impaired."  (Id.)

> **(k)   State Agency Psychiatric Evaluations, January
> 2004 and May 2005**

On January 20, 2004, Dr. Nenuca Bustos, and on May 5, 2005,
Dr. Thomas Harding, both state agency psychological consultant,
completed psychiatric review and found that Plaintiff had
affective disorder and anxiety-related disorder, along with
dysthymic disorder and PTSD.  (R. at 226-31, 292-97.)  Dr.
Harding found Plaintiff had a mild degree of limitation on
activities of daily life and social function and moderate
limitation in maintaining concentration, persistence or pace.
(R. at 236, 302.)  Plaintiff never had repeated episodes of
deterioration of extended duration.  (Id.)  Dr. Harding noted:
"Objective use data are consistent w/ mild-moderate
[psychological] related limitation.  Adaptive capacity
limitations are associated w/ physical/pain issues, where they
exist."  (R. at 304.)

Also on May 5, 2005, Dr. Harding completed a mental RFC
assessment and found that Plaintiff was moderately limited in her
ability to understand, remember, and carry out detailed
instructions, to maintain attention and concentration for
extended periods, to perform activities within a schedule, to
maintain regular attendance, to complete a normal workday and
workweek without interruptions from psychologically based
symptoms, to accept instructions and respond to criticism, to
respond to changes in the work setting, to travel in unfamiliar

places or use public transportation, and to set realistic goals.
(R. at 306-07.)

### (l)   Cooper Neurological Institute, February 2006

On February 7, 2006, Dr. Mitra Assadi of Cooper Neurological
Institute diagnoses Plaintiff with mild to moderate carpal tunnel
syndrome on her right arm.  (R. at 392-94.)

### (m)   Dr. Ronald Bagner, August 2006

On August 15, 2006, Dr. Ronald Bagner of the New Jersey
Department of Labor, Division of Disability Determination
Services, reported that he saw Plaintiff from 11:48 a.m. to 12:10
p.m.  (R. at 465-66.)  Plaintiff complained of "burning, pinching
pain in the left arm" and "pain radiating up to the cervical area
and down the right arm."  (R. at 465.)  Dr. Bagner observed that
Plaintiff got on and off the examination table without
difficulty, dressed and undressed without assistance, and was
comfortable seated during the interview.  (Id.)  Dr. Bagner found
a normal range of motion in Plaintiff's shoulders, elbows,
forearms, wrists, and fingers.  (R. at 465-66.)  He further found
that Plaintiff could make a fist and oppose thumb and that she
had full grip strength.  (R. at 466.)  Plaintiff was
hypersensitive to light palpation of her left upper arm.  (Id.)
Dr. Bagner completed a passive range motion chart noting that
Plaintiff could fully extend, make fists and oppose fingers on
both hands.  (R. at 467.)  Dr. Bagner reported that Plaintiff had

24

full grip and pinch strength in both hands and could separate
papers and button buttons.  (Id.)  In a medical source statement
of Plaintiff's ability to do work-related physical activities,
Dr. Bagner reported that Plaintiff could occasionally lift and/or
carry 25 pounds and frequently lift and/or carry 20 pounds.  (R.
at 469.)  Sitting was not affected by Plaintiff's impairment, but
pushing and pulling were affected.  (R. at 470.)  Plaintiff could
occasionally climb, balance, kneel, crouch and stoop, but never
crawl.  (Id.)  Finally, Dr. Bagner found that Plaintiff had
unlimited manipulative functions, including reaching, handling,
fingering, and feeling.  (R. at 471.)

> **(n)  Cape Counseling, July 2005 and November 2006**

On July 25, 2005, Plaintiff appeared for an intake
appointment at Cape Counseling, at which she was diagnosed with
adjustment disorder with mixed anxiety and depression, sexual
abuse as a child, avoidance personality disorder, and a current
GAF score of 65, with the highest GAF in the past year as 60.
(R. at 461.)  On November 28, 2006, Joanna Frankel, an outpatient
therapist with Cape Counseling, reported that Plaintiff had been
in individual therapy since July 25, 2005 and had been diagnosed
with adjustment disorder with depressed mood.  (R. at 475.)  Ms.
Frankel reported that Plaintiff's therapy was focused on
adjusting to her physical limitations.  (Id.)

## II.   DISCUSSION

### A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Social Security benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'"  Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health

& Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting

Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards. <u>Sykes</u>, 228 F.3d at 262; <u>Friedberg v. Schweiker</u>, 721 F.2d 445, 447 (3d Cir. 1983); <u>Curtin v. Harris</u>, 508 F. Supp. 791, 793 (D.N.J. 1981).

**B.   Disability Defined**

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that - (a) involves doing significant and productive physical or mental duties; and

28

(b) is done (or intended) for pay or profit."  20 C.F.R. §
404.1510.  This definition presupposes a regular, continuing, and
sustained ability to perform such work.  Kangas v. Bowen, 823
F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine
disability by application of a five-step sequential analysis
codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates
each case, step-by-step, until a finding of "disabled" or "not
disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as
follows:

> 1. If the claimant currently is engaged in
> substantial gainful employment, the claimant
> is "not disabled."
>
> 2. If the claimant does not suffer from a
> "severe impairment," the claimant is "not
> disabled."
>
> 3. If the severe impairment meets or equals a
> listed impairment in 20 C.F.R. Part 404,
> Subpart P, Appendix 1 and has lasted or is
> expected to last for a continuous period of
> at least twelve months, the claimant is
> "disabled."
>
> 4. If the claimant can still perform work the
> claimant has done in the past ("past relevant
> work"), despite the severe impairment, the
> claimant is "not disabled."
>
> 5.  Finally, the Commissioner will consider
> the claimant's ability to perform work
> ("residual functional capacity"), age,
> education and past work experience to
> determine whether or not the claimant is
> capable of performing other work which exists
> in the national economy.  If the claimant is
> incapable, a finding of disability will be

> entered.  On the other hand, if the claimant
> can perform other work, the claimant will be
> found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777.

**C.   Analysis**

    1.   Whether the ALJ Erred in Rejecting Plaintiff's Testimony Regarding Her Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome and Failing to Abide By Social Security Ruling 03-2p

Plaintiff argues that the ALJ improperly discredited her testimony regarding the full limiting effects of her RSDS/CRPS and its associated pain and failed to abide by SSR 03-2p, which discusses how to evaluate cases of RSDS/CRPS.  The Commissioner responds that the ALJ properly analyzed Plaintiff's credibility, found her testimony regarding her functional limitations to be contradicted by her stated daily activities, and so the ALJ's

credibility determination is supported by substantial evidence. The Court finds, for the reasons stated below, that Plaintiff's testimony regarding the limiting effects of her pain is not inconsistent with her testimony regarding her daily activities or the medical evidence in the record and is in accord with SSR 03-2p, so that the ALJ's credibility determination is not supported by substantial evidence.

In making his ultimate determination regarding disability, the ALJ was required to determine the extent to which Plaintiff's subjective complaints of pain interfered with her ability to work.  20 C.F.R. § 404.1529(c); SSR 96-8p.  The ALJ must give serious consideration to the claimant's subjective complaints of pain, even though those assertions are not fully confirmed by the objective medical evidence, Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986), but the ALJ is not bound to accept unquestioningly the credibility of such subjective evidence. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  The ALJ may "evaluate the credibility of a claimant and arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant."  Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Secretary of HHS, 504 F. Supp. 288 (E.D.N.Y. 1980)).  In the end, the ALJ must indicate the basis

for conclusions that the claimant's testimony is not credible.
See generally Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981).

Properly evaluating subjective complaints of pain is
especially essential, and complicated, when the claimant suffers
from RSDS/CRPS.  SSR 03-2p.  The Commissioner has consequently
prepared Social Security Rule 03-2p to guide in evaluating
disability claims based on RSDS/CRPS -- a ruling which the ALJ
failed to mention.  As noted supra, note 2, RSDS/CRPS is a
"chronic pain syndrome" that can be triggered by "a minor
injury."  Id.  "A diagnosis of RSDS/CRPS requires the presence of
complaints of persistent, intense pain that results in impaired
mobility of the affected region," with the degree of pain often
"out of proportion to the severity of the injury."  Id.  It is
the pain, and not the triggering injury, that has the potentially
disabling effect.  SSR 03-2p.  That pain is "transitory" and can
"spontaneously occur[]."   Id.  Consequently, SSR 03-2p
repeatedly reminds reviewing officers to carefully consider "the
effects of pain and its treatment on an individual's capacity to
do sustained work-related physical and mental activities in a
work setting on a regular and continuing basis."  SSR 03-2p; see
SSR 96-7p and SSR 96-8p.

In the present case, the ALJ found that Plaintiff suffers
from RSDS/CRPS and further that this condition was severe.  (R.
at 22.)  Nevertheless, the ALJ found Plaintiff's reported

restrictions inconsistent with her own testimony at the hearing
as well as the preponderance of the medical evidence.  (R. at 33-
34.)  In support of his credibility determination, the ALJ
pointed to Plaintiff's testimony and submissions regarding her
daily activities, (R. at 33-34), and the medical evidence
suggesting that she has "full grip and pinch strength" and can
perform 50% of the easiest activities with her left arm, (R. at
34).  Plaintiff's claimed restrictions, however, involve not
merely her physical strength, but her chronic pain and the degree
to which that pain interferes with her ability to do sustained
activity, five days a week.  Plaintiff testified that she has
limited use of her left hand and that she suffers from pain that
sometimes interferes with her ability to do just about anything.
(R. at 515-19, 540-42.)  The Court finds that Plaintiff's
testimony and statements regarding her functional capacity is not
inconsistent with her testimony regarding her daily activities
nor with much of the medical evidence in the record, and so the
ALJ's credibility determination is not supported by substantial
evidence.

Contrary to the ALJ's finding, Plaintiff's statements
regarding her daily activities are consistent with her statements
regarding the limiting, and sometimes incapacitating, effects of
her pain.  At her hearing, Plaintiff listed activities that she
can do, with limitations, including cooking, laundry, some

33

cleaning, ride on a stationary bike, use a hula hoop, and
walking.[8]  (R. at 515-17, 527.)  She explained, however, that
when she overuses her left arm, or strikes her left arm, or just
has a bad day, her pain will dramatically reduce her functional
capacity, so that she cannot even shower or brush her teeth.  (R.
at 514, 529, 541-42.)  Similarly, the ALJ relied on Plaintiff's
statement in the August 18, 2004 Function Report, in which she
listed daily activities that included household chores and going
to the post office.  (R. at 122-25.)  Yet again, Plaintiff made
clear in her report that her activities are not the same each
day, and when her pain is particularly bad -- such as on damp,
cold days -- she can do only the "bare minimum of activities."
(R. at 129.)  In both her August 20, 2004 and April 10, 2005
reports, Plaintiff repeats her statements that her pain is
chronic, but that on some days it becomes virtually
incapacitating.  (R. at 141-47, 174.)  Thus, Plaintiff's
testimony (and past statements) regarding her daily activities is
not inconsistent with her testimony (and past statements)

---

[8] Contrary to the ALJ's summary of Plaintiff's testimony,
(R. at 25), Plaintiff did not testify that she does gardening or
Pilates exercises.  Instead, she said this:

Q.   . . . What other things might you do around the house?
A.   Well, I've tried gardening.  I'm trying to do that, trying
     to get outside to get out, you know.  I've tried doing
     Pilates, as far as exercise.  I couldn't do those because of
     using my arms.

(R. at 524.)

regarding her inability to perform sustained work, five days a week, each week.[9]  This error alone justifies remand, for the Court cannot determine whether the ALJ would have reached the same conclusion regarding Plaintiff's credibility and her RFC had he properly evaluated her testimony and past statements regarding the consistency of her daily activities.  See Foley v. Barnhart, 432 F. Supp. 2d 465, 479 (M.D. Pa. 2005) (courts should affirm the ALJ's decision "if there is 'no question that he would have reached the same result notwithstanding his initial error.'") (quoting Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994)).

Plaintiff's testimony regarding her degree of pain and her inability to perform sustained work is similarly not inconsistent with the medical evidence.  The ALJ found, citing SSR 96-7p, that "[Plaintiff] has an impairment that is reasonably expected to produce the type of symptoms she alleges, but her complaints suggest a greater severity of impairment than can be shown by the

_____

[9] Moreover, though it is appropriate for an ALJ to consider daily activities when relevant to evaluating a claimant's subjective complaints of pain, the ability to care for ones personal needs, perform limited household chores, and occasionally travel cannot be used to show ability to engage in substantial gainful activity.  Frankenfield v. Bowen, 861 F.2d 405, 408 (3d. Cir. 1988); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.").  See also 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities or social programs to be substantial gainful activity.").

objective medical evidence alone." (R. at 33.) The medical evidence shows, with some variation, that Plaintiff has the physical capacity to perform some tasks with both of her hands, limited by weight and dexterity. See Dr. Bednar's Vocational Physical Activities Evaluation (could lift and carry up to 10 pounds, but could not engage in repetitive grasping, pushing/pulling, and fine manipulation of her left hand) (R. at 313); Dr. Kwon's November 19, 2003 Report ("Range of motion remains good at all areas except for at the elbow. It is painful for her to open and close her hand but she has no limitation.") (R. at 248); Dr. Brustein's July 19, 2004 Report[10] (finding full range of motion and strength on isolated muscle strength test) (R. at 269); Dr. Rubin's August 4, 2004 Report (can do 50% of easiest activities but cannot do 50% of hardest activities of the left arm) (R. at 277); Dr. Tobias' August 12, 2004 Report (full range of motion in the left elbow but Plaintiff complained of pain) (R. at 389); Dr. Facciolo's August 31, 2004 Report (could lift and carry no more than 10 pounds and cannot pull with her left arm) (R. at 203-04); Dr. Michel's RFC Assessment (can frequently lift 10 pounds but is limited in her ability to handle and finger) (R. at 281-83); Dr. Bagner's August 15, 2006 Report

_____

[10] Though Dr. Brustein stated in his brief report that Plaintiff's CRPS was "resolved," (R. at 270), it appears that the ALJ did not give this opinion weight for he found that Plaintiff has RSDS/CRPS of the left arm and that this impairment is severe, (R. at 22).

(has full grip strength but was hypersensitive to light palpation
of left upper arm) (R. at 466).  Of the medical evidence
presented, however, only Dr. Kwon evaluated Plaintiff's pain and
its impact on her functional abilities.  The other doctors
recorded her complaints of pain and then performed a physical
examination to measure her strength and range of motion, meeting
with her only once (Dr. Brustein, Dr. Bagner, Dr. Rubin), twice
(Dr. Bednar), years prior to the evaluation (Dr. Facciolo), or
not at all (Dr. Michel).  Dr. Bednar, on whom the ALJ relied
heavily, expressly referred her elsewhere for an evaluation of
her pain. (R. at 312.)

Dr. Kwon reported that in the months following the two
stellate ganglion blocks, Plaintiff reported significant
reduction in pain and so Dr. Kwon affirmed Dr. Bednar's physical
activities report.  (R. at 419-37.)  Plaintiff's statements were
not inconsistent with these reports, for she acknowledged that
the two nerve blocks relieved her pain, but only for a short
time.  (R. at 142.)  In fact, Dr. Kwon noted on March 29, 2004,
that though Plaintiff's arm was doing better, she still had some
days when her arm felt like it was in spasm.  (R. at 416.)  On
May 20, 2004, the day he released Plaintiff from regular care,
Dr. Kwon also diagnosed her with CRPS (despite his earlier
opinion that she did not have RSDS/CRPS) and noted that she had
residual issues involving pain management.  (R. at 240-41.)  It

may be that the ALJ found Plaintiff's statements regarding the short period of relief following the blocks to be incredible, but he failed to so state and the Court cannot speculate.

Plaintiff's statements regarding her subjective pain, while not specifically supported by the medical evidence in the record (though several doctors found atrophy in Plaintiff's left arm),[11] are not contradicted by the evidence.  In evaluating Plaintiff's RSDS/CRPS, the ALJ was not free to reject Plaintiff's statements about the intensity and persistence of her pain based solely on a lack of objective medical evidence.  SSR 96-7p(4).  To the extent that the ALJ possibly had other grounds for rejecting Plaintiff's testimony regarding the severity and limiting effect of her pain, such as her demeanor as a witness, he failed to include these reasons in his opinion and the Court cannot affirm on those grounds.  Because the ALJ did not correctly evaluate Plaintiff's credibility consistent with SSR 03-2p, and because the Court is not in the position to make such a credibility determination, remand is required.  See McCarthy v. Commissioner of Social Sec., No. 95-4534, 1999 WL 325017, at *19 (D.N.J. May 19, 1999) (ALJ is best able to judge credibility because he has the opportunity to observe the claimant first hand).

---

[11] As noted above, several doctors did find atrophy in Plaintiff's left arm, suggesting disuse due to pain.

2.   Whether the ALJ Improperly Gave No Weight to the
      Opinion of Doctor Richard Rubin

Plaintiff argues that the ALJ erred when he gave no weight
to the opinion of Dr. Richard Rubin solely because Dr. Rubin was
not a treating physician.  Defendant responds only briefly,
asserting that the ALJ could reject a medical opinion because it
was not from a treating physician.  The Court finds that the ALJ
committed legal error in rejecting Dr. Rubin's opinion and this
error independently requires remand.

When making a disability determination, the ALJ is obligated
to "consider all the evidence and give some reason for
discounting the evidence [he] rejects."  Plummer v. Apfel, 186
F.3d 422, 429 (3d Cir. 1999).  The ALJ may choose what medical
opinions to credit but "cannot reject evidence for no reason or
for the wrong reason."  Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (internal citations omitted).  While it is certainly
true that the opinion of a treating physician is generally given
great weight, it is not true that the opinion of a non-treating
physician is given no weight merely because it comes from a non-
treating physician.  20 C.F.R. § 404.1527(b) and (d); see Kosik
v. Director, Office of Workers' Compensation Programs, 50 F.
App'x 509, 512 n.7 (3d Cir. 2002) ("A treating physician's
opinion does not per se trump that of a non-treating physician.")
Instead, the governing regulations provide that, "Regardless of
its source, we will evaluate every medical opinion we receive."

39

20 C.F.R. § 404.1527(d).  The regulations then list a number of factors to consider, including the examining relationship, the treatment relationship, the nature and length of the treatment relationship, whether the opinion is supported by evidence, and whether the opinion is from a specialist.  Id.

In the present case, the ALJ gave no weight to the opinions of both Dr. Rubin and Dr. Tobias[12] "as neither doctor was [] a treating physician and only examined the claimant once."  (R. at 30.)  The ALJ went on to observe that Plaintiff's symptoms of mental impairment, as observed by Dr. Rubin, might be treatable, and further that Dr. Rubin found that Plaintiff could do 50% of the easiest tasks of the left arm and that Dr. Rubin had failed to relate Plaintiff's disability to a particular exertional level.  (R. at 30.)  Finally, the ALJ noted that Dr. Rubin's opinion was inconsistent with Dr. Brustein's opinion.  (R. at 31.)  None of the above are reasonable grounds for giving no weight to Dr. Rubin's opinion.  As previously stated, the mere fact that Dr. Rubin was not a treating physician and saw Plaintiff once was not grounds for rejecting his opinion.  See 20 C.F.R. § 404.1527(d).  In fact, the ALJ relied on opinions by several doctors who only saw Plaintiff once, including Dr.

_____

[12] Plaintiff does not challenge the ALJ's decision to give no weight to Dr. Tobias' opinion, perhaps because the ALJ later explained that he gave no weight because Dr. Tobias' opinion was internally inconsistent and lacked objective or clinical findings to support the report.  (R. at 30-31.)

Brustein, Dr. David London, and Dr. Bagner, and as well as the various State Agency consultants who never examined the Plaintiff.  (R. at 29-32.)  Dr. John Bednar, on whom the ALJ relied heavily, only saw Plaintiff twice over a period of four months, three years prior to the issuance of the ALJ opinion. (R. at 27-28.)

The ALJ offers no other valid reason for giving no weight to Dr. Rubin's opinion.  Certainly, the fact that Plaintiff's mental symptoms might be treatable does not undermine the merits of Dr. Rubin's diagnosis.  Nor was Dr. Rubin obligated to link his findings to a particular exertional level -- a job generally reserved for the ALJ.  See  20 C.F.R. § 404.1527(e)(1). Likewise, assuming there is a conflict between the opinions of Dr. Rubin and Dr. Brustein, both physicians who only examined Plaintiff once, the ALJ cannot reject Dr. Rubin's opinion and credit Dr. Brustein's opinion without giving a reason.  See Morales, 225 F.3d at 317.  Consequently, the ALJ erred in the manner in which he rejected Dr. Rubin's opinion.  Nor is this error harmless, for Dr. Rubin's opinion speaks to Plaintiff's limitations due to RSDS, (R. at 278), and her mental limitations, (R. at 279), both of which, if properly weighed, might have altered the ALJ's RFC analysis.  The ALJ will have the opportunity to re-vist this issue upon remand.

41

### 3.   Remaining Challenges

Having found that the ALJ committed several errors that justify remand, the Court will only briefly address Plaintiff's remaining challenges to the ALJ opinion.  The Court will only note that Plaintiff's remaining arguments attack the ALJ's interpretation of the medical evidence -- all findings of fact that the Court determines are either supported by substantial evidence or reflect a harmless error.  For the sake of clarity, the Court observes, and Defendant concedes, that the vocational expert in this case testified that Plaintiff could only perform the job of surveillance systems monitor and expressly ruled out the job of call-out operator.  (R. at 577.)  On remand, the ALJ should take this into account if he reaches step five of the disability analysis.

## III. CONCLUSION

For the reasons stated above, this Court will vacate the Commissioner's decision and finds that remand to the Administrative Law Judge is warranted.  The accompanying Order is entered.


**November 23, 2009**                      **s/ Jerome B. Simandle**
DATE                                  JEROME B. SIMANDLE
                                      United States District Judge